**ST. LOUIS UNIVERSITY, Plaintiff,**

v.

**The UNITED STATES, Defendant.**

**American Cyanamid Co., Plaintiff,**

v.

**St. Louis University, Defendant.**

Nos. CIV.JFM–95–CV–3639,
CIV.JFM–99–CV–1316.

United States District Court,
D. Maryland.

Jan. 25, 2002.

Raymond F. Altman, Baltimore, MD, Marc S. Moller, Henry Gluckstern, Kreindler & Kreindler, New York City, Rex Carr, Carr, Korein, East St. Louis, IL, Stanley P. Kops, Kops & Fenner, Philadelphia, PA, P. Terrence Crebs, Herzog, Crebs & McGhee, St. Louis, MO, for St. Louis University.

Perry F. Sekus, Lynne A. Battaglia, U.S. Attorneys Office, Baltimore, MD, Mary McElroy Leach, Frank Hunger, U.S. Dept. of Justice, Washington, DC, for U.S.

Roger W. Yoerges, Wilmer, Cutler and Pickering, Washington, DC, David P. Donovan, Wilmer Cutler and Pickering, Tysons Corner, VA, for American Cyanamid Co.

## MEMORANDUM

MOTZ, District Judge.

These two related cases may be the last involving the Sabin oral polio vaccine that was the subject of MDL proceedings before me. *See In re Sabin Oral Polio Vaccine Prod. Liab. Litig.,* 743 F.Supp. 410 (D.Md.1990) (*"Sabin I"*); 763 F.Supp. 811 (D.Md.1991) (*"Sabin II"*); 774 F.Supp. 952 (D.Md.1991) (*"Sabin III"*). They arise from a $16 million judgment obtained by Danny Callahan in a medical malpractice action instituted against St. Louis University ("SLU") in Missouri. After the judgment was affirmed on appeal by the Missouri Supreme Court, SLU instituted an action against the United States in this court for contribution, contending that the paralysis from which Callahan suffers was caused by his having been administered a dose of vaccine derived from a seed I found in the MDL proceedings to have been wrongfully approved by the government. SLU instituted a similar action in Missouri against American Cyanamid ("Cyanamid"), the parent of Lederle Laboratories, the manufacturer of the vaccine. SLU eventually consented to the dismissal of that action after extensive discovery had been conducted. In April 1999, I granted a motion for summary judgment in favor of the United States against SLU. In the wake of that decision, Cyanamid filed a declaratory action against SLU, and I entered summary judgment in its favor as well. SLU appealed from both decisions. The Fourth Circuit reversed my rulings and remanded the cases for further proceedings.

Although no further discovery has been conducted after remand, the parties have agreed that renewed summary judgment motions are appropriate. In its action against the United States, SLU has moved for partial summary judgment on the issues that the government was negligent and that its negligence was at least one of the proximate causes of Callahan's paralysis. The United States also has requested summary judgment. Similarly, Cyanamid has filed a summary judgment motion in its declaratory judgment action against SLU.

## I.

The relevant background facts concerning the underlying *Callahan* action, the *Sabin* MDL proceedings, and the prior history of SLU's contribution action against the United States were succinctly stated by the Fourth Circuit in its opinion reversing my ruling in the case against the United States. 5 Fed.Appx. 133, 136–37 (4th Cir.2001). That opinion was not published in the Federal Reporter, and I will take the liberty of quoting from it verbatim:

A. The State Court Action

In 1978, three-month-old Danny Callahan received a dose of Orimune, an oral vaccine containing an attenuated strain of a live polio virus. Approximately one month later, Danny developed a perirectal abscess that was treated by employees of Cardinal Glennon Hospital and SLU. The abscess was not drained and no culture was taken to determine if the infection was caused by gram positive or gram negative bacteria. Danny was given an antibiotic that was effective only on gram positive bacteria. After several days, Danny's condition had not improved, and his mother noticed that his legs appeared to be "floppy." His parents took him back to the hospital, where the abscess was incised and drained. Cultures of the abscess revealed four types of gram negative bacteria, and Danny was given an antibiotic that was effective against those organisms. Although the abscess improved, Danny's legs and left arm remained paralyzed. Type III polio virus (the type in

the vaccine dose he had received) was isolated in Danny's stool, and, although some experts disagree, it appears that Danny suffers from vaccine-associated polio.

The Callahans filed a medical malpractice action against SLU, Cardinal Glennon, and American Cyanamid Company, parent company of the manufacturer of the vaccine. At the time of trial, only SLU and Cardinal Glennon remained as defendants. The Callahans' expert witnesses testified that Danny's paralysis was caused by the negligence of SLU and Cardinal Glennon in failing to treat the abscess properly when Danny was first brought to the hospital. According to the experts, the improper treatment allowed endotoxins to be released, which suppressed Danny's immune system. Because Danny's immune system was compromised, the attenuated polio virus contained in the vaccine was able to replicate fast enough to overcome his suppressed immune system, resulting in poliomyelitis. The Callahans' experts testified that if the abscess had been treated properly from the outset, the endotoxins would not have been released, his immune system would not have been suppressed, and he would not have contracted polio.

SLU and Cardinal Glennon, however, presented evidence that Danny's paralysis was not connected to the abscess and that it was caused by the attenuated polio virus in the vaccine mutating to a virulent form after it had been ingested. They presented evidence showing that in the 1980s approximately one in four hundred thousand people receiving Orimune developed polio. Their experts also testified that the Callahans' theory that endotoxins suppress the immune system making a host more susceptible to vaccine-induced poliomyelitis was not supported by any known research.

The jury returned a $16 million verdict against SLU and Cardinal Glennon. After the trial, Cardinal Glennon entered into a settlement agreement with the Callahans. SLU appealed, and the jury's verdict was affirmed by the Missouri Supreme Court sitting en banc. *See Callahan v. Cardinal Glennon Hosp.*, 863 S.W.2d 852 (Mo.1993) (en banc).

B. *In re Sabin*

While the *Callahan* case was winding its way through the Missouri court system, multi-district Orimune cases filed against the United States government under the Federal Tort Claims Act were transferred to the District of Maryland for resolution of the common legal and factual questions....

The plaintiffs in the *In re Sabin* cases contracted polio after receiving a Type III Orimune vaccine or after coming into contact with a recipient of the Type III vaccine. They sued the government, alleging, inter alia, that the National Institute of Health's Division of Biologic Standards negligently issued a license to Lederle Laboratories (a subsidiary of American Cyanamid) to manufacture the vaccine and improperly approved vaccine that did not meet the "neurovirulence" standards set forth in the governing regulations. The district court ultimately concluded that the government violated the governing regulations and was negligent in approving certain vaccine "seeds" and the release of lots derived therefrom and that its negligence was a proximate cause of the injuries suffered by the plaintiffs, who received or were exposed to vaccines from lots derived from the improperly approved seeds. *See* 774 F.Supp. at 957–58, 763 F.Supp. at 821–25. The district court's *Sabin* opinions were affirmed by this Court on appeal. *See In re Sabin Oral Polio Vaccine Prod. Liab. Litig.*,

984 F.2d 124 (4th Cir.1993) (per curiam). The Orimune vaccine received by Danny Callahan was derived from one of the vaccine seeds that the *In re Sabin* cases concluded were improperly approved by the government. . . .

5 Fed.Appx. at 136–37.

## II.

█ After stating these background facts, the Fourth Circuit went on to decide that I erred in holding that under Missouri law (which undisputably is applicable here) the findings adverse to SLU in the *Callahan* case would have a collateral estoppel effect in a subsequent contribution action. In effect, the Fourth Circuit held that SLU was free to present in a contribution action the defense it had lost in *Callahan,* i.e., that its alleged malpractice in improperly treating Callahan's abscess was immaterial because known research does not support the opinion expressed by Callahan's experts that endotoxins suppress the immune system, making a host more susceptible to vaccine-induced polio.

SLU acknowledges that the invalidity of the immunosuppression theory has not yet been established in this case, and it is not moving for complete summary judgment on the ground that its own negligence was *de minimis* or nil. It is seeking only a ruling that the United States was negligent and that the negligence was at least one of the proximate causes resulting in Callahan's paralysis. The United States has agreed to be bound in this litigation by the regulatory violations that were found to exist in *Sabin II.* (United States' Opp'n at 2.) It also has stipulated to owing a duty of care to Callahan.[1] (*Id.* at 15.) Although it stipulates to duty and to the regulatory violations, the United States does not admit to proximate cause.

In my original opinion I found that "none of SLU's experts have expressed an opinion that, if Callahan had been given a vaccine that satisfied the neurovirulence requirements of the applicable regulations, he would not have contracted polio."[2] SLU has not supplemented the record on this point in any respect, and I adhere to that finding. The United States contends that the absence of any such opinion is fatal to SLU's claims since in order to

---

1. In *Sabin III,* I applied the Good Samaritan doctrine of the Restatement (Second) of Torts § 324A (1965) as the source of the duty the government owed to the plaintiffs, parents who had contracted polio from shed virus after their children were administered vaccine. 774 F.Supp. at 954. I noted that in cases, such as this one, in which persons contracted polio as the result of vaccine administered directly to them, the source of duty is found in a parallel provision, Restatement (Second) of Torts § 323 (1965). *Id.* at 954 n. 5. That provision covers situations in which a tortfeasor renders services to another and, by failing to exercise reasonable care, causes injury to that person. *See id.* Missouri has adopted § 323 as part of its tort law. *See Stanturf v. Sipes,* 447 S.W.2d 558, 561–62 (Mo.1969); *Strickland v. Taco Bell Corp.,* 849 S.W.2d 127, 132 (Mo.Ct.App.1993).

2. In its initial opinion the Fourth Circuit held that this finding was erroneous because Robert Baltimore, one of SLU's experts, had "stated that, in his opinion, an excessively neurovirulent vaccine would produce more severe paralysis than would a vaccine that complied with all regulatory requirements." However, on April 25, 2001, after the United States filed a petition for clarification or rehearing pointing out that SLU had represented that it was not offering Dr. Baltimore as an expert on neurovirulence, the court issued an order stating that "the panel opinion should not be construed as determining the admissibility of any expert testimony. The District Court is free to consider *de novo* any evidentiary issues that might be raised on remand." SLU has not attempted to broaden the area of Dr. Baltimore's proffered expertise. Therefore, I continue to find, as I did originally, that nothing he has opined is sufficient to establish that a vaccine complying with the regulations would not have caused Callahan to contract polio.

establish proximate cause, SLU must prove that Callahan contracted polio as the result of excessive neurovirulence in vaccine derived from a seed that had been wrongfully approved. Stated conversely, according to the United States, SLU must prove that vaccine derived from a seed meeting regulatory requirements would not have had the same effect as did the vaccine that Callahan received.

The United States made a similar argument in *Sabin III*, and I found it unpersuasive. I held that proximate cause was established by the mere fact that "if ... [seeds 45 B 85 and 45 B 165 [3]] had not been in use, the vaccine giving rise to the injuries would not have been manufactured. The evidence clearly establishes that but for ... [the United States's] negligence, the seeds would not have been used." 774 F.Supp. at 958. I went on to reject an ancillary contention made by the government that proximate cause was dispelled by the fact that the specific lots involved in the two cases under consideration had met the regulatory neurovirulence criteria, and I concluded that "the causal connection between the regulatory violations and plaintiffs' injuries are logical, sensible and direct." *Id.* The Fourth Circuit affirmed this holding on appeal.

My reasoning in *Sabin III* is equally applicable here.[4] This can be most easily seen by hypothesizing that SLU is correct in contending that the immunosuppression allegedly caused by its malpractice played absolutely no role in making Callahan susceptible to contracting polio from OPV. If that is true, Callahan stands in exactly the same position as did the plaintiffs in other *Sabin* cases because in that event the sole cause of his polio was the vaccine. Likewise, even if the immunosuppression did play some role in the disease process, Callahan's exposure to the oral vaccine had to be a contributing cause to his paralysis. The isolation of Type III polio virus in Callahan's stool demonstrates he contracted polio, and no one suggests that the immunosuppression alone could have caused the disease. Accordingly, as I held in *Sabin III*, Callahan was exposed to the virus as a consequence of the government's violation of the OPV regulations. If the government had not wrongfully approved the seed from which the vaccine was derived, Callahan would never have been administered a dose of Orimune and would never have contracted polio even if he had been immunosuppressed. This "but for" relationship meets the standard of proximate cause under Missouri law just as it does under the law of Maryland and Florida applicable in *Sabin III*. See *Callahan*, 863 S.W.2d at 860–61 (explaining that "but for" causation means that " 'the defendant's conduct is a cause' of the event if the event would not have occurred 'but for' that conduct") (*quoting Prosser and Keeton on Torts* § 41 (5th ed.1984)); *Martin v. City of Washington*, 848 S.W.2d 487, 493 (Mo.1993) (en banc) (describing the "sim-

---

3. The vaccine administered to Callahan was derived from seed 45 B 85.

4. It might appear that I am modifying the view I originally took in this case that SLU's case was critically flawed by the absence of evidence that a less virulent vaccine would not have caused Callahan's paralysis. The context in which I expressed that view was, however, substantially different from the one now presented. As I have already indicated, in my original opinion I held that my collateral estoppel ruling foreclosed SLU from relying on the opinion of its experts that it had not been negligent at all and that the Orimune administered to Callahan had been the sole cause of his polio. I further found that because of that holding the only way that SLU could prevail would be to render its own negligence immaterial by proving that a less neurovirulent vaccine would not have caused a person in an immunosuppressed state to contract polio. The Fourth Circuit's decision has mooted this line of reasoning.

plest test for proximate cause" as "whether the facts show that the injury would not have occurred in the absence of the negligent act"); *Bauman v. Conrad*, 342 S.W.2d 284, 287 (Mo.Ct.App.1961) ("The proof must show that had the negligence not occurred, the ... plaintiff's injuries would not have occurred.").[5]

For these reasons, I find that the United States is liable in contribution because its violations of its own regulations constituted negligence and were a proximate cause of Callahan's paralysis. I am not making any determination as the extent of that liability. If I ultimately conclude that Callahan likely would not have contracted polio but for SLU's failure to make a proper diagnosis and treatment of his abscess, SLU will be subject to a substantially greater share of liability than the United States. If, on the other hand, Callahan's immunosuppression was, as SLU contends, merely coincidental and not a material factor in causing him to contract polio, the greater share of liability will fall upon the United States. Resolution of these issues must await the development of a full factual record.

### III.

■ I will now turn to the issues raised by Cyanamid's declaratory judgment action. I find that Cyanamid cannot be held liable for contribution to SLU and that it is therefore entitled to summary judgment. While I recognize that this holding may seem asymmetrical, paradoxical, or even perverse in light of my finding that the government is liable for contribution, the difference in result flows from the difference in the nature of the respective duties owed by the United States and Cyanamid

to those who were exposed to the live virus contained in OPV.

■ As indicated above, in *Sabin III* I ruled that the Good Samaritan doctrine and its parallel provision, Restatement (Second) of Torts § 323, imposed upon the government the duty not to approve vaccine seeds in violation of the OPV regulations. Cyanamid was under no such duty. Its duties and responsibilities to the members of the public, particularly to OPV recipients and their families, is defined by products liability law. In considering claims against Cyanamid, the focus must therefore be on the safety of its product, not the regulatory process for which the government bore responsibility. Likewise, in analyzing the element of proximate cause in claims against Cyanamid, the focus must be on whether the plaintiff can prove that it was a defect in the OPV that resulted in his injury, not simply—as in a case against the government—whether he had been exposed to OPV derived from a seed that had been improperly approved in violation of the regulatory process. Under Missouri law this element of causation is required whether a plaintiff sues for strict liability, negligence, or breach of warranty. *See, e.g., Bone v. Ames Taping Tool Sys., Inc.*, 179 F.3d 1080, 1081 (8th Cir.1999) ("Under Missouri law, to prevail on a claim of strict liability, negligence, or breach of warranty, [plaintiff] must prove that his use of the [defendant's product] directly caused or contributed to cause some or all of his injuries."); *Chism v. W.R. Grace & Co.*, 158 F.3d 988, 991 (8th Cir.1998) (explaining that for negligence or strict liability claims under Missouri law, a plaintiff must establish a causal connection between the defendant's conduct and the plaintiff's

---

**5.** I should point out that in ruling against the United States on this issue, I am not relying upon the doctrine of collateral estoppel, which may not be invocable against the government. *See United States v. Mendoza*, 464 U.S. 154, 162, 104 S.Ct. 568, 78 L.Ed.2d 379 (1984). I am simply following my reasoning in *Sabin III* that was affirmed on appeal.

injury); *Nesselrode v. Executive Beechcraft, Inc.*, 707 S.W.2d 371, 375–76 (Mo. 1986) (en banc) (holding that the plaintiff in a strict liability product defect case must show that the defect caused his injuries); *Mothershead v. Greenbriar Country Club, Inc.*, 994 S.W.2d 80, 89 (Mo.Ct.App. 1999) (requiring proof of causal link between product defect and injury in failure to warn case).

■ Product safety regulations certainly may provide a reference point in defining the standard of conduct a manufacturer must meet in fulfilling its duty to consumers under products liability law.[6] Likewise, violations of safety regulations may subject a manufacturer to governmental enforcement action, including criminal prosecution under appropriate circumstances. However, such violations do not provide themselves provide a basis for a private right of action independent of general tort principles. *See In re Orthopedic Bone Screw Prod. Liab. Litig.*, 193 F.3d 781, 791–92 (3d Cir.1999). Moreover, although I recognize that at least one court has concluded to the contrary, *see Campagna v. American Cyanamid Co.*, 337 N.J.Super. 530, 767 A.2d 996 (2001), I am of the view that violation of the OPV regulations is not sufficient to prove the element of proximate cause in

a context, such as that presented by SLU's claims against Cyanamid, where a plaintiff must prove that it is more likely than not that it was excessive neurovirulence in a dose of vaccine that caused him to contract polio. The regulatory criteria were developed entirely from monkey neurovirulence tests and, as the absence of any proffered expert testimony by SLU affirms, the results of those tests alone are not sufficient to establish a causal connection between a particular individual's contraction of polio, on the one hand, and the marginal difference in neurovirulence between vaccine derived from a seed compliant with the OPV regulations and vaccine developed from a non-compliant seed, on the other.[7]

On the surface this holding might appear to contradict the statement I made in *Sabin III* that "it must be concluded that by releasing vaccine lots whose monkey neurovirulence test results exceeded the regulatory criteria, DBS increased the risk of harm to persons who were vaccinated and . . . exposed to the shed virus." 774 F.Supp. at 955. However, in *Sabin III* I was not considering the issue of whether a dose of Orimune had been a proximate cause of a particular individual's paralysis: an inquiry which, under products liability

6. It might be noted that in this case reference solely to the literal language of the OPV regulations as setting the substantive standard of care in a products liability action would be problematical since the persons responsible for enforcement of the regulations (including some of the best scientists in the United States) had concluded that the safety standards the regulations embodied were unreasonably high. Indeed, that was the very reason they approved seeds whose test results did not meet the strict regulatory criteria. Likewise, the fact that the OPV regulations have been abolished is a factor than could be considered in determining whether Orimune was defective. *See* Restatement (Third) of Torts § 4 cmt. d (1998) ("When repeal or invalidation [of a statute or regulation] takes

place post-injury, but prior to adjudication, the court may take the repeal or invalidation into account in deciding whether noncompliance with the statute or regulation renders the product defective.")

7. If the vaccine lot from which the Orimune administered to Callahan itself passed the criteria set by the OPV regulations, a matter the parties appear to dispute, that would pose an additional *obstacle to SLU's proof in this* case. Although, as noted previously in the text and explained in *Sabin III*, 774 F.Supp. at 958, this fact is not relevant to the proximate cause analysis in a case against the United States, it might be fatal to a claim against Cyanamid, even if the claim were otherwise viable.

law, requires proof of a causative connection between the paralysis and a defect in Orimune. Rather, I was addressing the question of whether by approving seeds not compliant with the OPV regulations, the United States had breached its duty to the members of the public, which it had assumed by virtue of its undertaking to regulate a potentially hazardous condition for the benefit of others. Resolution of that question required me to determine whether the United States had "increase[d] the risk of . . . harm" to those who were vaccinated or otherwise exposed to the live polio virus within the meaning of § 324A of the Restatement (Second) of Torts.[8] In making that determination, I found that the neurovirulence criteria of the OPV regulations—which the government itself had adopted—provided "the best available scientific standard" for determining potential excessive neurovirulence and that the government had therefore increased the risk of harm to the public. *Id.*

I did not find, however, that Orimune was, in fact, excessively neurovirulent when administered to humans or that an OPV meeting the regulatory criteria would not have equally caused the *Sabin III* plaintiffs to contract polio. Once I found that the United States had breached its duty by increasing the risk of harm to the public, the only proximate causal connection I found necessary to make was the one established by the essential fact that if seed 45 B 85 (and seed 45 B 165) had not been improperly approved, the vaccine to which the *Sabin III* plaintiffs were ex-posed would never have been put into use. *Id.* at 958.

Several final comments, somewhat reiterative though they are, perhaps are in order to explain why I am holding the United States, but not Cyanamid, liable for contribution. Whether or not an oral polio vaccine that complied with the OPV regulations would have caused Callahan and the plaintiffs in the other *Sabin* cases to contract polio ultimately is unknowable and unprovable. What is known, or at least that which I found to be demonstrated by the record in the MDL cases, is that the OPV program "has resulted in the virtual eradication of wild poliovirus in the Western Hemisphere," that it was "perhaps the most successful public health program in history," and that the OPV manufactured by Lederle "has always been 'state of the art.'" *Sabin II,* 763 F.Supp. at 813. This combination of the unknowable and the known make it impossible for SLU to prevail on a claim against Cyanamid since, as I have indicated, such a claim, arising solely under products liability law, requires proof that a product defect caused the plaintiff to suffer injury.

The claim against the United States, however, turns on a more fundamental principle: the necessity of upholding the rule of law. In *Sabin II* I found that although the officials responsible for the establishment and implementation of the OPV program were "extraordinarily able professionals who consistently acted in the public interest as they reasonably perceived it to be," 763 F.Supp. at 813, I also found in *Sabin III* that they "arrogated to

---

8. The *Campagna* court, in quoting the language in question, recognized that I was not analyzing the element of proximate cause but was rather "[c]ommenting on an issue closely akin" to it. 767 A.2d at 1003. The accuracy of this reading is confirmed by the fact that the quoted language appears in the section of my opinion entitled "Existence of Duty," not the section entitled "Proximate Cause." Moreover, I prefaced my statement with the observation (based upon the evidentiary record) that "there is no necessary or definitive correlation between the results of monkey neurovirulence tests and a vaccine's neurovirulence when administered to humans. . . ." 774 F.Supp. at 955.

themselves the power to define what constituted an acceptable [public health] risk." 774 F.Supp. at 957. They purposely decided not to amend the regulations embodying the neurovirulence criteria they originally deemed proper because they believed that considerations of health policy so required. I have never questioned the subjective good faith of those officials or, indeed, the objective reasonableness of their decision from a public health perspective. But in taking the actions they did, they increased the risk that several more individuals would contract polio as a result of exposure to OPV than would have done so if the OPV regulations had been strictly followed. It may well be that the rest of us were beneficiaries of a resultant harm suffered by a few. For that very reason, it is proper that we collectively be held liable for our government's actions.

A separate order effecting the rulings in this memorandum is attached.

## ORDER

For the reasons stated in the accompanying memorandum, it is, this 25th day of January 2002, ORDERED that:

1. Plaintiff's Motion for Partial Summary Judgment in *St. Louis University v. United States* is granted.

2. Plaintiff's Motion for Summary Judgment in *American Cyanamid Co. v. St. Louis University* is granted.